No. 19,018.

MARY FALK, *Appellee*, v. WILLIAM BURKE, *Appellant*.

SYLLABUS BY THE COURT.

1. MARRIAGE CONTRACT—*Breach—Omission to Marry on Day Set Not Necessarily a Breach of Marriage Contract.* An omission to marry upon a particular day is not necessarily a breach of a promise of marriage; the contract necessarily continues in force until the one or the other of the parties by conduct or words manifests an unwillingness to proceed to carry it out, and a *bona fide* offer to marry is a defense to an action for a breach of promise to marry, where it is made before the plaintiff has signified her intention to end the matter, although the defendant may have been guilty of conduct that would warrant the plaintiff in considering the engagement at an end.

2. SAME—*Acts Constituting a Waiver of Breach of Marriage Contract.* The failure of one to carry out such contract of marriage at the appointed time does not terminate the contract, unless there is an unequivocal election on the part of the other to consider the contract as terminated; and if, following such failure to carry out the contract at the designated time, negotiations are entered upon for the purpose of arranging a subsequent date for the marriage, such negotiations in law constitute a waiver of whatever rights may have accrued by the failure to be married at the designated time.

3. SAME. Plaintiff and defendant entered into a contract of marriage in March, 1912, and the date for the ceremony was afterwards fixed for the 25th of September. The marriage did not take place on the date fixed, through the fault of the defendant, or on account of circumstances over which he had no control. *Held*, the plaintiff could not after said date continue to treat the contract as still in existence and negotiate with the defendant for the setting of a future date, and then afterwards elect to treat the contract as having been broken by the postponement of the marriage on the original date.

4. TRIAL—*Answer to Special Questions Contrary to Evidence—Excessive Damages*. Upon the facts stated in the opinion, held, that certain answers of the jury to special questions are in conflict with the undisputed testimony and require the granting of a new trial; that there was error in the refusal to give certain instructions, and that, in view of all the facts and circumstances of the case and the financial worth of the defendant, a verdict awarding the plaintiff $10,000 damages is excessive.

Appeal from Atchison district court; WILLIAM A. JACKSON, judge. Opinion filed October 10, 1914. Reversed.

*S. M. Brewster*, of Troy, for the appellant.

*James W. Orr, S. E. Harburger*, and *C. J. Conlon*, all of Atchison, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The plaintiff recovered a judgment against the defendant for $10,000 in an action for breach of promise to marry. The defendant appeals.

Mary Falk, the plaintiff, lived near Purcell, in Doniphan county. She was twenty-three years of age and the daughter of a prosperous farmer. William Burke was thirty-three years of age and lived on a farm near Horton. They commenced going together in January, 1912, and became engaged in March of that year. On

the 4th of August of the same year they each signed the following paper:

"PURCELL, KAS., Aug. 4-12.

"This to certify that there is a promise of marriage between William Burke of Horton, Ks., and Mary Falk of Purcell, Ks., whereto they affix their signatures.

WILL BURKE.
MARY FALK.

"Witness: Fr. RAPHAEL, O. S. B.

Sometime thereafter they agreed on the 25th of September, 1912, as the date for the wedding, and it was to take place at seven o'clock in the morning at St. Mary's church in Purcell. The parties were communicants of the Roman Catholic church, and the bans were published under the rules of that church in both the Purcell and Holton parishes. On September 15 the defendant received a letter from the plaintiff, in which she informed him that she had been talking to Father Raphael, the priest of the parish, and that he had asked her to tell the defendant to write to the parish where he was baptized and get a record of the baptism, and she also notified him that Father Raphael would like to see him. The defendant, with his brother, went to see the priest, and informed him that the defendant had been baptized in Ireland when about two days old and according to the rules and customs of the Catholic church. The demand for the baptismal record by Father Raphael was made under the authority of an edict or decree issued by the Pope, which became effective on March 6, 1911, and which prescribed that priests were not permitted to assist at a marriage unless assured of the free condition of the contracting parties, and required that the baptismal certificate be demanded from the parties if they had been baptized in another parish. It being apparent that the defendant would be unable to obtain such a certificate from Ireland in time for the day fixed for the wedding, Father Raphael prepared a paper to be signed and sworn to by Mrs. Mary Burke, the defendant's mother. The

defendant made some objection to this paper, claiming that it was not called for by the rules of the church, and the matter was talked over a good deal between the plaintiff and the defendant. The parties went together to see Father Raphael, and at that time the certificate had not been signed by the defendant's mother. The plaintiff testified there had never been any trouble of any kind between her and the defendant. The defendant's failure to appear at the church on the 25th appears to have grown out of this demand for a baptismal record or a sworn statement and his refusal to have it signed by his mother. The defendant wrote the plaintiff a letter, which she received on the same day, after the hour fixed for the wedding. The letter is as follows:

HORTON, KANSAS, Sept. 25th, 12.

"*Miss Mary Falk, Huron, Kansas.*

"Well Mary, I thought I would drop you a few lines. I am sorry that things had gone so far. Mary, if you and Father Raphael have done all of this planning, you can see what your good friends have done for you. But whenever Father Raphael or anybody else think that they can run a bluff on me, they are badly fooled. He was greatly worried about me and my genealogy, but my history in Horton, where I have lived since I left Ireland when I was fifteen years old, although Father Raphael being a Priest, my character can compete with his any old day. He can not throw any slur on me or my people, to tell me that he did n't know whether I was baptized or not. I am defiant to him. When it goes that far I don't have to go to his Parish to get a wife. Both myself and my people have hunted Fr. Raphael for two days. Mike was at his house at half past eight on Monday evening, and no tidings of him.

"So while your people have planned so well together, I wish you luck.

I am, very respectfully, WILL BURKE."

The plaintiff testified that he came to see her the following Sunday, on the 29th, and they talked about his not coming to the wedding; that soon thereafter they went together to see Father Raphael; that on this

Falk v. Burke.

occasion the defendant asked her to set another day
for the wedding; that she told him she would like to
have next day to think it over and she would then let
him know whether she cared to marry him or not;
that he took her home, and on the next day she wrote
him a letter which was sent to him by registered mail.
The letter reads:

"PURCELL, KANS., Sept. 30-12.
"*Mr. Wm. Burke, Horton, Kansas.*

"Answering your question of yesterday, will say
that I will again be ready to be married Friday, Oct. 4.

As ever,        MARY FALK.

"Please leave me know of your arraingments."

The defendant replied as follows:

"HORTON, KANSAS, Oct. 2th, 12.
"*Miss Mary Falk, Huron, Kansas.*

"WELL MARY—Your note was received, which of
course you know by the receipt, but it is impossible for
me to be ready by next Friday the fourth, as I only got
your note this evening. As the notice is too short, we
will have to set another date. Also I have to make ar-
raingments on where to be married, as Fr. Raphael
never will marry me. All of those things takes a little
time, and we will have to decide on some future date
if satisfactory to you.

I am most respectfully,        WM. BURKE."

October 4 she sent him another letter by special de-
livery, as follows:

"PURCELL, KANS., Oct. 4-12.
"*Mr. Wm. Burke, Horton, Kansas.*

"You told me Sunday a week ago to make arrange-
ments for another date. I did so and you put the wed-
ding of again. I can not stand the pressure any longer,
you must come over by Sunday and make final arrange-
ments.        Yours truly,        MARY FALK."

The defendant answered as follows:

"HORTON, KANSAS, Oct. 7th, 12.
"*Miss Mary Falk, Purcell, Kansas.*

"Mary, your note of the fourth was received. Well,
Mary, you asked me to go over yesterday and make

7—93 KAN.

final arrangements. Well, I could n't see the use in me go over yesterday, as my visits to your place of late only seem to add fire to fuel, more especially I have no special arrangements to make. I think that I asked you in my last letter where you wanted to be married and you did n't make me any the wiser of subject. I told you definitely that I will not be married by Fr. Raphael, not under any circumstance. You fix this up the best you can and let me know immediately.

"Mary, if you think I am putting this off you are mistaken, as you fully understand who has put it off, and who has caused all of the trouble. The very gentleman has tried to put me and my dead father who is molding into dust, also my mother's honor in her old age as a Christian and a Catholic, by compelling her to sware to my Christianity, or to think that they should raise infidells or heathens and have the presumption of going up to the altar railing and receive the blessed sacrament. Fr. Raphael's blunder might seem all right to your people, but it certainly does not to me. There are a great many Priests as well as lay people that get things mixed up in to their noodles which they fully do not understand, for instance I will cote you a clipping from the paper about Fr. Phelan of the Watchman.

"Father Phelan of the Western Watchman, persisted in his foolish explanation of the recent decision of the Vatican on the Netemere marriage decree until Archbishop Glennon wrote him a letter on the subject.

"Now, Mary, you are the same with me in my estimation as you were when I first met you although you don't seem to think so, even by your letters, but of course you are poisoned against me, but I am only holding to my principal and of those that are near and dear to me, had you occasion perhaps you would act as I have, there is not any other priests that sees the situation as Fr. Raphael sees it. Now in conclusion I will say that I will be ready to get married at any time after the 17 of this Month except on Friday. I don't want to marry on Friday. Any other day of the week will be pleasing to me, so you may state where you want to get married and by whom. I have stated positively that Fr. Raphael won't marry me, either do I want to go to see his reverence any more.

"So hoping to hear from you soon, I am as ever your friend            WM. BURKE."

Falk v. Burke.

The correspondence was closed October 9, by the following letter from the plaintiff, which she sent by special delivery:

"PURCELL, KANS., Oct. 9-12.

"*Mr. Wm. Burke, Horton, Kans.*

"DEAR FRIEND—Yours of yesterday received and contents noted. Now, Will, you know that I can make no arrangements as to who is to marry us.

"I never placed any impediments in the way of our getting married. You yourself raised all the objections. This is a matter entirely between you and me, and Fr. Raphael, according to your own words, has nothing to do with it any more.

"For my part I am perfectly willing to be married from St. Mary's.

"So I expect you to make all necessary arrangements as soon as possible, and I must have definite word from you before Tuesday 15th.

"I can not stand this delay and misery any longer. You have failed to appear twice at appointed dates and I do not expect you to fail a third time.

"If you have a spark of manhood left in you, do for Heaven's sake, say what you intend to do.

"This letter to you is final.

As ever, your friend     MARY FALK."

There is not much conflict in the evidence. Plaintiff testified that the defendant told her Father Raphael had given him the certificate to be signed by his mother, but that he did not think he would have it signed as he did not want to bother his mother about signing it; that on the Sunday before September 25, the first date fixed for the wedding, she and the defendant went twice to the home of Father Raphael to see him but he was not present; they went to talk further about the certificate; that she knew all the time that the certificate had not been signed and that the defendant talked to her over the telephone the afternoon before the 25th and said he had not seen Father Raphael; that she at first wanted to be married from the home parish and wanted Father Raphael to perform the ceremony, but was willing afterwards to be married in another parish

and by another priest; that she had told defendant that the rule of the church required the certificate and that it ought to be procured; that she was willing to marry him but expected him to have the certificate; that she knew he could make the arrangements if he wanted to because it was within his power to do so; that the night before the date fixed for the wedding she was expecting the defendant to come to rehearse for the wedding ceremony; that after having waited until after nine o'clock her brother called the defendant's brother, Mike Burke, and asked him if the defendant was coming out, and received word that he did not know whether Will was coming at all or not. She testified that when she wrote the defendant on October 7, she understood that if he did not say marry by the 15th she would have nothing to do with him any more; that she went to Atchison on the 15th, and commenced this action on the 16th, and that Father Raphael came to the office of her attorney the day the suit was commenced. The defendant testified that up until the time fixed for the wedding he was doing all he could to overcome the obstacles to his marriage; that he had been to see the bishop of the diocese, and the bishop informed him that Father Raphael was exceeding his authority in making the demand for the baptismal record. It appears from the evidence that Father Raphael went to the bishop and showed him the rule under which he was acting and the bishop conceded that Father Raphael was right.

While there is no evidence of any quarrel between the plaintiff and the defendant, the letters that passed between them indicate that they had never been ardent lovers. The defendant sought to show that the interference of Father Raphael was the cause of the trouble and delay.

The defendant submitted six special questions to the jury, which they answered as follows:

"Q. 1. When the marriage contract was made in March, 1912, was it determined upon what day it was to be celebrated, if so, what day? Ans. No.

"Q. 2. Was it expressly agreed at the time the contract was made in March, 1912, that the marriage was to be performed according to the rules and regulations of the Catholic Church? Ans. Yes.

"Q. 3. When was the defendant first informed that it was necessary to secure a certificate of his baptism, or a statement that would take its place, before he could be married? Ans. Sept. 15th, 1912.

"Q. 4. Had such certificate, or its equivalent, been secured by 7:00 a. m. September 25th, 1912? Ans. No.

"Q. 5. After the 25th of September, 1912, did the plaintiff and defendant continue these negotiations for the purpose of setting another date for the marriage? Ans. No.

"Q. 6. Did the parties, plaintiff and defendant, after September 25th, 1912, by their negotiations, conferences and correspondence upon the subject, treat the marriage contract of March, 1912, as still in force and only requiring the setting of a date which was mutually agreeable? Ans. No."

The defendant requested and the court refused to submit special questions 7 and 8, as follows:

"Q. 7. If you answer the last preceding question 'no,' then state what was the purpose of the negotiations, conferences and letters passing between the plaintiff and the defendant after September and before the institution of this action?

"Q. 8. Were the letters of the plaintiff written to the defendant subsequent to September 25th, 1912, and prior to the institution of this action, written for the purpose of arranging a date for the marriage in good faith and for the purpose of arranging for a date certain upon which the ceremony was to be performed?"

The errors complained of are the refusal of the court to sustain a demurrer to the plaintiff's evidence; error in the admission of testimony; error in the instructions given and in the refusal to give requested instructions; error in the refusal to submit the two special questions 7 and 8, and the further contention that certain of the answers to special questions are in direct conflict with the evidence; that the verdict is excessive, and that the court erred in refusing a new trial.

We think the plaintiff's contention that the evidence shows the parties agreed to be married in accordance with the rules of their own church, and that those rules became a part of the marriage contract, is correct. (*Wanecek v. Kratky*, 69 Neb. 770, 96 N. W. 651, 66 L. R. A. 798.) The defendant's contention that the jury ignored the undisputed testimony in their answers to special questions 5 and 6 must be sustained. In response to these questions the jury said that after September 25 the plaintiff and defendant did not continue negotiations for the purpose of setting another date for the marriage, and that they did not by their conferences, negotiations and correspondence treat the marriage contract made in March as still in force. Both answers are in direct conflict with the undisputed facts as shown by the written letters that passed between the parties as well as by the admission of the plaintiff as a witness at the trial. The plaintiff testified that on September 29, the Sunday following the day the marriage was to have taken place, the defendant asked her to set another date for the wedding; that she told him she would like to have the next day to think it over and then would let him know whether she cared to marry him or not, and on the next day she wrote him:

"Answering your question of yesterday, will say that I will again be ready to be married Friday, Oct. 4.

As ever, MARY FALK.

"Please leave me know of your arraingments."

On cross-examination she testified:

"Q. When Will came out there Sunday you and he discussed the proposition of another date for the marriage, did n't you? A. He asked me to set another date, and I told him I wanted to think it over until the next day and then I would decide.

"Q. And after thinking it over, what did you decide? A. To have the marriage next Friday.

. . . . . . . . . . . .

"Q. State whether you considered it broken or going ahead—is that right? A. I considered it broken; but I had the right to say yes or no whether I cared to marry him or not.

"Q. But it was with reference to go ahead with this same ceremony; he had n't again proposed to you? A. No; but he asked me to set another date, and I did so.

"Q. And you said you were not sure you would set another date or not? A. I told him I would like to think it over.

"Q. And after thinking it over you thought you could get married on the 4th? A. I told him I would again be ready on the 4th."

At another place she testified:

"Q. Now, at the time you . . . received the letter of October 7th, from Will Burke, you understood that you and he were still negotiating about a date for a marriage between you? A. When I wrote to him I understood that if he did n't say marry by the 15th I would have nothing to do with him any more."

Aside from the admissions made by the plaintiff on the witness stand no one could read the correspondence without coming to the conclusion that the parties did continue negotiations for the purpose of setting another date for the marriage. The conflict between the evidence and the findings is sufficient of itself to require that the verdict be set aside and a new trial granted. Undoubtedly the plaintiff had the right, if she had seen fit, to consider the contract as breached on the 25th, and in such case might have maintained her action. In *Wanecek v. Kratky,* 69 Neb. 770, 96 N. W. 651, 66 L. R. A. 798, the parties had mutually agreed on the date and hour of the marriage. In the opinion it was said:

"The violation of this part of their agreement, without just cause, amounted to a breach of the contract on the part of the plaintiff in error, and defendant in error, as she well might do, elected at the time to consider the contract ended and to sue for damages." (p. 772.)

In the present case the undisputed evidence is that the plaintiff did not elect to treat the contract as broken and to sue for damages, but, on the contrary, saw fit to waive the breach occurring on the 25th of September, and to enter into further negotiations for a marriage at

a subsequent date. In *Kelly v. Renfro,* 9 Ala. 325, 44 Am. Dec. 441, it was held that an omission to marry upon a particular day is not a breach of an engagement of marriage; that the contract necessarily continues in force until the one or the other of the parties, by conduct or words, evinces that he or she is unwilling to proceed to the ordinary result, and that a *bona fide* offer to marry is full defense to action for a breach of promise to marry, where it is made before the female has signified her intention to end the matter, although the defendant may have been guilty of conduct that would warrant the plaintiff in considering the engagement at an end. In the opinion it was said:

"In the present case, it can not be doubted, the lady was entirely warranted in considering the engagement as terminated so soon as the note of her suitor was communicated to her; but until she manifested her intention to consider it in that light, it can not be construed into a refusal to marry. In our judgment, if the defendant afterwards, in good faith, proposed to proceed to consummate the contract with her, in a reasonable time, he can in no sense be said to have refused to marry the plaintiff. We do not wish to be understood as asserting the law will tolerate that a man may trifle with the affections and feelings of a virtuous female, and afterwards avoid the consequences of his inhumanity by a simulated offer to marry; but if the offer is made *bona fide,* and before the female has signified her determination to end the matter, such an offer is a full defence to a suit for a breach of the contract. This seems to be the result of the decision in *Southard v. Rexford,* 6 Cowen, 254." (p. 728.)

Upon this theory of the law defendant requested instruction No. 8, as follows:

"A mutual promise of marriage is a contract equally binding upon both parties and can not be annulled excepting by mutual consent, and the failure of one to carry out such contract of marriage at the appointed time does not terminate the contract, unless there is an unequivocal election upon the part of the unoffending party to consider the contract as terminated, and if, following such failure to carry out the contract at the

designated time, negotiations are entered upon for the purpose of arranging a subsequent date for the marriage, such negotiations in law constitute a binding waiver of whatever rights may have accrued by the failure to be married at the designated time."

And also instruction No. 19, as follows:

"If the plaintiff and the defendant entered into a contract of marriage in March, 1912, and the date for such marriage was afterwards fixed for the 25th of September, 1912, and such marriage was not consummated at such time through the fault of the defendant or on account of circumstances over which he had no control, the plaintiff can not continue after said date to treat said marriage contract as still in existence and negotiate with the defendant for the setting of a future date and then afterwards elect to treat said contract as having been broken by the postponement of the marriage on the original date."

A number of other instructions were requested which presented substantially the same defense. We think the defendant was entitled to have instruction No. 19 or some similar charge given. It was predicated upon facts which the defendant alleged in his answer and upon which he offered evidence. The petition alleged a promise to marry on the 25th of September, and a breach on that day. The court instructed upon the theory upon which the plaintiff's petition was drawn, that she could recover if the jury believed from the evidence that on September 25 the defendant, "without justifiable cause, failed and refused to carry out the contract on his part." Instruction No. 6, which the court gave, reads:

"By the admission of the parties hereto, you will find that there was a contract of marriage between plaintiff and defendant and the wedding day was set for September 25, 1912, and if you find from the evidence that the defendant, without justifiable cause, failed and refused to carry out the contract on his part, then your verdict should be for the plaintiff, for such sum as to you may seem just and proper under the evidence and these instructions, not to exceed, however, the sum of $25,000.00."

Falk v. Burke.

The plaintiff relies upon the rule that facts constituting an estoppel *in pais* must be specially pleaded. Among the cases cited is *Insurance Co. v. Johnson,* 47 Kan. 1, 27 Pac. 100. In that case it was said in the opinion:

"The assured replied by a mere denial, which was nothing more than to say that no breach had occurred. . . . If the acts of waiver and estoppel had been pleaded, there was sufficient testimony produced by plaintiffs below to warrant the instructions given by the court." (p. 4.)

That case and others cited by the plaintiff can hardly be said to apply to the situation here, where the answer set forth all the facts upon which defendant relied as a defense and expressly states that "she and he both understood that the engagement heretofore existing between them was still in full force and effect," referring to the conversation of the 29th of September, and the fact that the plaintiff notified the defendant that she desired to be married on October 4. In *Way v. Bronston,* 91 Kan. 446, 138 Pac. 601, it was said:

"It is not necessary to label a cause of action. Its nature is determined by the facts stated." (p. 448.)

To the same effect see *In re Johnson,* 92 Kan. 59, 62, 139 Pac. 1161.

It is true that the answer after alleging the conversations and conferences which took place between the parties subsequent to September 25, and the letters passing between them, makes the statement that defendant has at all times been and is now ready, willing, able, and anxious to marry the plaintiff and was willing to marry her prior to the 25th of September, and after that date, and that it was mutually understood between the parties that the wedding be postponed on the 25th and take place at a later date. These averments are not, in our view of the pleadings, open to the objection that they are inconsistent with the

defense of waiver. As we understand the answer, it pleads the facts showing that plaintiff waived the breach of September 25, and elected to negotiate with the plaintiff for a postponement of the marriage. The two averments are consistent. The plaintiff contends the evidence shows there never was a *bona fide* offer on defendant's part to marry her after his breach of the contract on the 25th of September, but that was a question for the jury to determine.

In addition to the facts specially referred to in the foregoing part of the opinion, there were other facts proved showing that plaintiff did not consider the engagement at an end by defendant's failure to marry her on the day first agreed upon for the ceremony. Father Raphael testified that he took dinner at plaintiff's house on September 25, and talked with her. Afterwards, on the same day, he went to Michael Burke, the brother of the defendant, and got the certificate which he had previously prepared for Mrs. Burke to sign, and said: "I will secure the certificate which you refuse to secure." Then he called on Mrs. Burke about five o'clock in the afternoon; that she expressed slight hesitation about signing it, not knowing what it meant; that he explained it to her and she signed it; that on October 23 he wrote to the defendant, informing him that the bishop of the diocese had kindly requested the witness to authorize Father Hildebrand, who was the priest of the parish where the defendant lived, to perform the marriage ceremony for the defendant and the plaintiff. The letter contained this statement:

"Although on Sept. 25th at Horton I granted you permission to have the marriage ceremony performed by any priest of this diocese, I hereby renew this same permission in writing."

As a new trial must be ordered it is proper to say that we discover no prejudicial error in the admission or rejection of evidence. The questions asked in cross-examination of Father Raphael touching the character of proof that would have satisfied him of defendant's

baptism were proper, but the same witness as well as the bishop of the diocese testified as to what would have satisfied the rules of the church in this respect. We think the defendant was entitled to have special questions Nos. 7 and 8 submitted to the jury.

In view of all the circumstances of the case and the financial resources of the defendant as shown by the evidence, the amount of the judgment—if defendant is liable at all—seems excessive.

The judgment will be reversed and the cause remanded for another trial in accordance with the opinion.